690 So.2d 301 (1997)
Gerald R. EMIL
v.
THE MISSISSIPPI BAR.
No. 94-BA-00749-SCT.
Supreme Court of Mississippi.
January 9, 1997.
*303 William Liston, Liston & Lancaster, Winona; James Duke Cameron, Phoenix, AZ, Kendall Reeves, Davis & Emil, Gulfport, for Appellant.
Michael B. Martz, Jackson, for Appellee.
En Banc.
SULLIVAN, Presiding Justice, for the Court:

STATEMENT OF THE CASE
The Mississippi Bar through the office of its General Counsel brought this disciplinary *304 matter against Gerald R. Emil under the provisions of the Rules of Discipline for the Mississippi State Bar. The matter was initiated on or about April 13, 1988, when an informal complaint was filed with the Committee on Professional Responsibility of the Bar. The informal complaint was served on Emil on April 11, 1988, and on August 9, 1988, he filed his informal response pursuant to Rule 5.3 of the Rules of Discipline.
The Bar Committee on Complaints considered the informal complaint and response, and on November 4, 1988, the chairman of the committee advised General Counsel in writing that the Committee had referred the informal complaint to General Counsel. General Counsel further investigated the complaint pursuant to the provisions of Rule 7.2 for possible violations of Rule 4.1, 4.2, 4.3, 4.4, 5.3, 7.2, 7.3, and 8.4 of the Mississippi Rules of Professional Conduct.
On April 21, 1992, General Counsel filed with the Complaints Committee and served upon Emil its investigatory report. On October 16, 1992, the Disciplinary Committee determined that there was probable cause to believe Emil was guilty of "such conduct that, if proven, would warrant the imposition of discipline." The Disciplinary Committee directed General Counsel to file a Formal Complaint against Emil in accordance with the provisions of Rule 8 of the Rules of Discipline. The Committee's determination was that Emil's conduct was in violation of Rules 5.3, 5.4, 7.3, and 8.4(a) and (b) of the Mississippi Rules of Professional Conduct. On November 13, 1992, General Counsel filed the Bar's formal complaint against Emil. This complaint consisted of seven separate and factually unrelated counts, primarily charging violations of either the Mississippi Code of Professional Responsibility or the Mississippi Rules of Professional Conduct. The gravamen of each of the counts of the formal complaint was that Emil violated the provisions that prohibit solicitation of employment. On December 31, 1992, Emil responded to the formal complaint by filing his motions to dismiss and his answer presenting Rule 12(b), Mississippi Rules of Civil Procedure, defenses.
After a period of discovery this matter came on for hearing before a Complaint Tribunal of this Court consisting of Honorable Larry Roberts, Circuit Judge; Honorable Patricia Wise, Chancery Judge; and James Robertshaw, Esq., on October 14-15, 1993, and on June 13-16, 1994.
The Tribunal denied Emil's motions to dismiss the claim for multiplicity of counts, for prejudicial delay, and for separate trials on each of the seven counts of the formal complaint. At the conclusion of the Bar's case-in-chief and after all evidence was in, the Tribunal denied Emil's motions for directed verdicts as to counts one, two, and five. At the conclusion of the evidentiary trial, the complaint tribunal directed the parties to file with the tribunal a proposed opinion and judgment. On June 28, 1994, the Bar filed its proposed opinion and judgment, in which it proposed to the Tribunal that the evidence supported only the following judgment as to punishment:
[a.] For Count One, Mr. Emil should receive a PRIVATE REPRIMAND.
[b.] For Count Two, Mr. Emil should receive a thirty (30) day SUSPENSION.
[c.] For Count Three, Mr. Emil should receive a thirty (30) day SUSPENSION consecutive to the suspension imposed in Count Two.
[d.] For Count Four, Mr. Emil should receive a PRIVATE REPRIMAND.
[e.] For Count Five, Mr. Emil should receive a thirty (30) day SUSPENSION consecutive to the suspensions imposed in Counts Two and Three hereof.
[f.] For Count Six, Mr. Emil should receive a ninety (90) day SUSPENSION consecutive to the suspensions imposed in Counts Two, Three, and Five hereof.
[g.] For Count Seven, Mr. Emil should receive a SUSPENSION of not less than one (1) year to run consecutive to the suspensions imposed in Counts Two, Three, Five, and Six hereof.
On July 19, 1994, the Tribunal rendered its written Opinion and Judgment in this *305 matter. It (1) denied Emil's motion for a directed verdict as to counts one, two, three, five, six and seven of the complaint; (2) granted Emil's motion for a directed verdict as to count four; and (3) found that there was clear and convincing evidence that Emil violated the following provisions of the applicable Mississippi Code of Professional Responsibility or the Mississippi Rules of Professional Conduct as to the following counts in the stated particulars:
1. Count One ("Catchings Complaint"): That Emil circumvented DR2-103(A), Mississippi Code of Professional Responsibility, and violated DR1-102(A)(2), Mississippi Code of Professional Responsibility, in that acting through one Albert Fountain he expressly or by implication encouraged and/or directed Fountain to make contact with Ms. Catchings for the purpose of securing employment for Emil.
2. Count Two ("Burgeois Complaint"): That Emil circumvented the provisions of DR2-103(A), Mississippi Code of Professional Responsibility, and violated the provisions of DR1-102(A)(2), Mississippi Code of Professional Responsibility, in that he directed Fountain to contact Mr. Burgeois at a time when Fountain was subject to the supervision and control of Emil and was at least following Emil's direct or implied instructions.
3. Count Three ("Buckley Complaint"): The Tribunal found that Fountain's contact with the Buckley family after an automobile accident in which William R. Buckley was injured was at the direction of Emil and that, therefore, Emil violated DR1-102(A)(2), Mississippi Code of Professional Responsibility, and DR2-103(A), Mississippi Code of Professional Responsibility.
4. Count Five ("Kaufman Complaint"): That Emil violated the provisions of Rule 8.4(a), Mississippi Rules of Professional Conduct, by attempting to violate the provisions of Rule 5.4(a), Mississippi Rules of Professional Conduct, in connection with Fountain's contact with Otis Kaufman, a Mississippi Highway Safety patrolman between March 5 and April 11, 1988, for the alleged purpose of getting Kaufman to refer potential personal injury cases arising from automobile accidents to Fountain because Fountain was subject to the control and supervision of the Respondent at the time of his contact with Kaufman, and Respondent failed to make reasonable efforts to insure that Fountain's conduct was compatible with Respondent's obligations as an attorney.
5. Count Six ("Rollison Complaint"): The Tribunal found that there was sufficient credible evidence offered at trial to meet the clear and convincing evidence burden of proof to show that Emil violated the provisions of Rule 8.4(a), Mississippi Rules of Professional Conduct, and attempted to violate the provisions of Rule 5.4(a), and 7.2(c), Mississippi Rules of Professional Conduct, by attempting to solicit Rollison to refer personal injury claims to him in return for which referral Rollison would be paid a percentage of the recovery.
6. Count Seven ("Denton/Dornan/Quave Complaint"): The Tribunal found that the Bar had shown by clear and convincing evidence that Emil obtained a wrongful death suit ("Moran Case") as a result of a promise to pay Fountain for referring the case to him; that Emil intended to share legal fees from the settlement with Fountain, a non-lawyer, in violation of the provisions of DR3-102, Mississippi Code of Professional Responsibility. And, that Emil engaged in conduct in connections with the Moran Case that was prejudicial to the administration of justice in that he engaged in conduct in connection with the case that adversely reflected on his fitness to practice law in violation of the provisions of DR1-102(A)(5) and (6), Mississippi Code of Professional Responsibility.
In addition to the specific findings set forth above, the Complaint Tribunal made the following general findings:
1. Emil demonstrated unprofessional and unethical conduct and conduct evincing unfitness for the practice of law which constituted cause for the imposition of discipline in connection with his violation of the charges made against him in counts one, two, three, five, six and seven.
2. That costs and expenses incurred in the investigation, which preceded the filing *306 of the formal complaint in this matter, totaled $1,586.38.
3. That the counts charged in the complaint clearly demonstrated part of a common plan or scheme on Emil's behalf to unethically solicit employment as an attorney.
The Tribunal, after making findings of fact relative to mitigation and/or aggravation, found as follows in regards to punishment to be imposed:
1. That discipline should be imposed upon Emil for the violation of the disciplinary Rules set forth in counts one, two, three, five, six and seven of the formal complaints;
2. That the proper sanction to be imposed against Emil was disbarment.
On July 25, 1994, Emil filed his notice of appeal to this Court from the Opinion and Judgment of the Complaint Tribunal filed with this Court on July 19, 1994.
I. DID THE TRIBUNAL ERR IN DENYING EMIL'S PRE-TRIAL MOTIONS?
A. The motion to dismiss the complaint due to unconstitutional delay.
B. The motion to dismiss the complaint due to multiplicity.
C. The motion for separate trials on each unrelated count of the complaint.
II. DID THE TRIBUNAL ERR IN THEIR EVIDENTIARY RULINGS?
A. Allowing the Mississippi Bar to introduce the deposition of Gwendolyn Catchings over the objection of Emil.
B. Allowing the introduction of hearsay out-of-court statements of Albert Fountain for the purpose of proving the existence of agency between Fountain and Emil.
C. Allowing the following witnesses called by the Bar to testify to hearsay statements of Albert Fountain: Gwendolyn Catchings, Donald Bourgeois, Otis Kaufman, and Peter Quave.
D. Allowing the testimony of Roger Wilder when said witness had not been previously disclosed pursuant to Emil's discovery requests.
III. DOES THE EVIDENCE IN SUPPORT OF COUNTS ONE, TWO, FIVE, SIX, AND SEVEN MEET THE CLEAR AND CONVINCING BURDEN OF PROOF?
IV. DID THE TRIBUNAL ERR IN BASING ITS RULINGS ON PUNISHMENT IN PART ON EVIDENCE PRESENTED TO THE SAME COMPLAINT TRIBUNAL IN AN UNRELATED TRIAL OF A FORMAL COMPLAINT FILED AGAINST EMIL BY THE MISSISSIPPI BAR?
V. DID THE TRIBUNAL ERR IN BASING ITS RULINGS ON PUNISHMENT IN PART ON TESTIMONY OF WITNESS GRABEN CONCERNING AN ALLEGED OBSTRUCTION OF JUSTICE ACT BY EMIL WITHOUT PRIOR NOTICE TO EMIL?
VI. IS THE PUNISHMENT IMPOSED BY THE COMPLAINT TRIBUNAL INAPPROPRIATE?

STATEMENT OF FACTS

General Facts
Emil is a graduate of Queens College in 1970 and the University of Mississippi School of Law, from which he received his Juris Doctorate in December, 1973. He is admitted to the practice of law in the State of Mississippi and before all federal and Mississippi state courts, the Fifth Circuit Court of Appeals, and the United States Supreme Court. He has practiced on a pro hac vice basis in Florida and Tennessee.
After his graduation from the University of Mississippi School of Law Emil began his practice in Gulfport, Mississippi. He has served as a legal advisor to Harrison County, as Assistant District Attorney, and in association and partnership at various times with various lawyers. From the time he established his own practice until present time he has primarily limited his practice to personal injury litigation.
Mr. Emil was not subject to any disciplinary actions in the states which admitted him on a pro hac vice basis. In Cause No. 93-BA-00609 *307 styled The Mississippi Bar v. Attorney HH, Emil was found in violation of advancing funds to a client by a Complaint Tribunal of this Court, and this Court upheld the Tribunal's findings and privately reprimanded Emil.

Facts pertinent to Complaint Tribunal's rulings on pre-trial motion to dismiss due to unconstitutional delay.
Emil moved the Tribunal at the commencement of the initial hearing to dismiss the formal complaint due to an unconstitutional delay of the prosecution of the cases or, in the alternative, on the grounds that the claims were barred under the doctrine of laches. Emil put on evidence in support of the motion which established the general chronology of events.
1. The Bar received the first informal complaint in this case on April 13, 1988.
2. Emil responded to the informal complaint on August 9, 1988.
3. The Bar's Complaints Committee on November 4, 1988, referred the case to the Bar for further investigation and for the filing of an investigatory report under Rule 7(b)(ii) of the Rules of Discipline.
4. The Bar requested three extensions of time within which to complete its investigation and report back to the Committee through September 13, 1989.
5. The investigatory hearing in the case took place on July 25-27, 1989.
6. The Bar, following the expiration of the third extension granted to the Bar by the Committee, made thirteen additional requests for extension of time in which to file an investigatory report with the Committee extending over a period of time from October 5, 1989, to March 4, 1992, none of which were noticed to Emil's attorney. The testimony of General Counsel as to the need for extensions was that General Counsel's office required time to review evidence taken in the July 25-27, 1989, investigatory hearing. Emil's counsel had interposed no objection to the first three requests for extensions.
7. The Bar filed the formal complaint on November 13, 1992, incorporating seven counts.
One hundred ninety six (196) days elapsed from the filing of the informal complaint on April 13, 1988, to the November 4, 1988, initial action of the Bar Committee referring the Complaint for further investigation and for filing of the investigatory report. Between the filing of the informal complaint and the filing of the investigatory report on April 21, 1992, one thousand four hundred thirty eight (1,438) days passed, approximately four years. One thousand six hundred thirty five (1,635) days elapsed from the date of the filing of the informal complaint until the Bar Committee made its determination of the existence of probable cause. The time that elapsed between the date of the filing of the informal complaint and the filing by General Counsel on November 13, 1992, of the formal complaint totals one thousand six hundred ninety five (1,695) days, approximately four years and four months.
During the hearing on the motion for dismissal due to unconstitutional delay, the Tribunal heard the testimony of the attorneys representing the Bar and Emil, the testimony of Emil, Emil's investigator, and expert testimony from Aaron Condon, a law professor at the University of Mississippi School of Law.
Mike Martz, General Counsel for the Bar, was called to testify by Emil and generally testified to the chronology set forth above. Martz's excuses for not sooner filing the investigatory report were: (1) he thought Emil's attorney had waived the time limits imposed on the Bar under the Rules of Discipline for the filing of the report; (2) the case was complex; and (3) he was busy on other matters.
William Liston, attorney for Emil, offered his statement under oath to the Tribunal concerning General Counsel's claim that there had been a waiver of the time for filing the investigatory report. Liston testified that the only time he had agreed to any extensions of time was an agreement to extend the time for conducting the investigatory hearing and an agreement to extend the time for the filing of the investigatory report to September, 1989.
*308 Emil testified that as to count one of the formal complaint, a material witness, Gwendolyn Catchings, was no longer available and that a material witness critical to count two could not be located at the time the formal complaint was filed due to the lapse of time. Emil further testified that there were three witnesses material to count three of the complaint who could no longer be located; two critical witnesses concerning count six of the formal complaint could not be located after the filing of the formal complaint; and that two witnesses with critical knowledge relative to count seven, namely, Chancellor John Morris and Attorney Tom Stennis, had passed away during the time the investigatory report filing was delayed. Emil further testified in detail as to the effect the delay had on his law practice and his physical well-being. Greg Buchko, an investigator hired by Emil to attempt to locate the material witnesses who might still be available to testify after the filing of the investigatory report, testified as to his unsuccessful efforts in locating those witnesses still thought to be alive.
Condon, after being qualified as an expert in the field of legal ethics, testified that, based on his education, training, the factual matters surrounding the time lapse between the filing of the informal complaint and the filing of the formal complaint, and based on reasonable professional certainty, he was of the opinion that General Counsel did not comply with the mandate of Rule 5, Rules of Discipline, which requires expeditious, timely and speedy handling of complaints. He further testified that in his opinion the time lapse between the institution of the proceedings and the filing of the formal complaint constituted prejudicial and impermissible delay which violated fundamental fairness and Emil's right to due process of law.
Neither Emil nor his counsel ever inquired of the Bar concerning the status of the numerous allegations lodged against Emil. The Tribunal heard the proof presented to it and ruled that Emil had not suffered any prejudice even if there was delay in bringing the formal charges against him.
The Tribunal denied the motion to dismiss on the ground that the Tribunal was of the opinion that the Sixth Amendment right to a speedy trial did not apply to attorney disciplinary proceedings. The Tribunal likewise overruled Emil's motion to dismiss due to a violation by the Bar of the time constraints imposed under Rules 5 and 7, Rules of Discipline, on the ground that time limits proscribed in said Rules are not jurisdictional under Rule 26, Rules of Discipline.

Facts pertaining to Emil's motion to dismiss the complaint due to multiplicity.
Emil, at the beginning of the formal hearing in this matter, moved the court to quash the formal complaint on the ground that it contained a multiplicity of separate and unrelated charges. The Tribunal denied the motion to dismiss or to quash the formal complaint on the ground of multiplicity.

DISCUSSION OF LAW

Standard of Review
The appropriate standard of review for a judicial disciplinary proceeding is derived from Rule 10(E) of the Rules of the Mississippi Commission on Judicial Performance which provides:
Based upon a review of the entire record, the Supreme Court shall prepare and publish a written opinion and judgment directing such disciplinary action, if any, as it finds just and proper. The Supreme court may accept, reject, or modify, in whole or in part, the findings and recommendation of the Commission. In the event that more than one (1) recommendation for discipline of the judge is filed, the Supreme Court may render a single decision or impose a single sanction with respect to all recommendations.
Mississippi Com'n on Judicial Performance v. Chinn, 611 So.2d 849, 850 (Miss. 1992)(citing Mississippi Judicial Performance Com'n v. Hopkins, 590 So.2d 857 (Miss. 1991)).
This Court has the non-delegatable duty of ultimately satisfying itself as to the facts and reaching such conclusions and making such judgment as it considers appropriate and just. Underwood v. Mississippi *309 Bar, 618 So.2d 64, 66-67 (Miss. 1993). Moreover, this Court reviews this matter de novo as to both liability and sanctions. Terrell v. The Mississippi Bar, 635 So.2d 1377, 1385 (Miss. 1994). Notwithstanding the fact that this Court has the ultimate and last say in what findings of fact, conclusions of law, and sanctions are imposed, it accords deference to the findings of the Tribunal and is not prohibited from giving the findings of fact made by the Tribunal such weight as in its judgment they deserve, so long as it does not lose sight of its non-delegatable duty. Levi v. Mississippi State Bar, 436 So.2d 781, 783 (Miss. 1983).

I. WHETHER THE COMPLAINT TRIBUNAL ERRED IN DENYING EMIL'S PRE-TRIAL MOTIONS.

A. The motion to dismiss the complaint due to unconstitutional delay.
Emil contends that the complaint against him should be dismissed due to the unconstitutional delay from the time of the filing of the informal complaint to the filing of the formal complaint and hearing. He correctly states that disciplinary proceedings are quasi criminal, see Barrett v. The Mississippi Bar, 648 So.2d 1154, 1159 (Miss. 1995), and therefore, due process must be afforded in disciplinary matters. See Netterville v. Mississippi State Bar, 397 So.2d 878, 884 (Miss. 1981). However, Emil then makes a leap that this Court has refused to follow. He states that "[i]t should be beyond peradventure that fundamental fairness and the Sixth Amendment right to a speedy trial is [sic] part and parcel of due process rights." It is this statement that Emil uses as a springboard to the idea that the constitutional right to a speedy trial also attaches to a disciplinary hearing.
This Court has specifically rejected this notion and refused to apply the factors enunciated in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in order to determine if there has been a constitutional violation due to delay in disciplinary matters. See The Mississippi Bar v. An Attorney, 636 So.2d 371, 374 (Miss. 1994). In An Attorney, the Complaint Tribunal dismissed charges against an attorney on the grounds that he was denied a speedy resolution of the charges against him. The Tribunal applied the Barker factors in reaching this decision. Id. at 373. The Bar appealed the decision and this Court held:
[T]he Tribunal's application of and Respondent's reliance on the Barker factors inapplicable to this case. First, the case sub judice is not a criminal case. The Respondent has a higher duty than does a criminal defendant. He is after all a lawyer, a member of the Bar and a person responsible to his clients, the Courts and Bar and finally responsible to the public at large. It is unseemly for a member of the Bar to assert and argue a criminal defense in a hearing concerning a professional misconduct charge.
Id. at 374. The standard proposed in An Attorney is not to apply the Barker factors, but to look at whether the attorney was prejudiced by the delay. This Court adopted the following test in An Attorney. "In order to bar disciplinary proceedings due to delay, the respondent must demonstrate substantial prejudice in his ability to present a defense." An Attorney, 636 So.2d at 375.
Emil contends that the right to a speedy trial is implicitly included in the due process rights afforded an attorney facing a disciplinary hearing. This Court has recognized that the attorney has due process rights that must be respected. See Mississippi State Bar v. Young, 509 So.2d 210, 212 (Miss. 1987); Attorney K v. Mississippi State Bar Ass'n, 491 So.2d 220, 222 (Miss. 1986); and Netterville v. Mississippi State Bar, 397 So.2d 878, 884 (Miss. 1981). However, one must draw the distinction between procedural due process rights and substantive due process rights. We have held that the attorney in a disciplinary matter has the right to notice, a hearing, and cross-examination of the witnesses. See Netterville, 397 So.2d at 884. On the other hand, this Court has declined to extend these due process rights to such substantive aspects as a jury trial. See Asher v. The Mississippi Bar, 661 So.2d 722, 728 (Miss. 1995). If an attorney does not have the right to a jury trial, why should he have a right to a speedy jury trial? The Sixth Amendment provides for both. However, we have failed to extend either right to a disciplinary *310 matter. Thus, this Court finds that the Tribunal erred in applying the Barker factors. Notwithstanding, we must on de novo review, look to see if the attorney was prejudiced in his preparation of a defense to the charges brought against him. If so, then the matter should be dismissed. See An Attorney, 636 So.2d 371, 375 (Miss. 1994).
Emil argues that he was prejudiced in two ways. First, he was unable to locate material witnesses as to Counts One, Two, Six and Seven or they had died. Second, he testified to the effect the delay had on his law practice and his mental and physical well-being. He further relies upon the testimony of Aaron Condon, who testified that the delay in this case was prejudicial and a violation of Emil's due process rights.
First, we would look at the claim of unavailable witnesses. In regards to count one, Emil identified Ms. Katherine Huggar as a witness with information concerning this count. He also testified that his investigator learned that Ms. Huggar passed away on December 5, 1986. Ms. Huggar died two years before the informal complaint was filed. Accordingly, any prejudice due to her unavailability is not due to the delay in the proceedings.
Emil identified Ms. Gwendolyn Catchings as being unavailable to appear at the trial of this cause. However, Ms. Catchings was at the investigatory hearing and was extensively cross-examined by Emil's counsel at that time. Thus, there was no prejudice due to her absence.
As to count two, Emil testified that a "material witness" critical to said count could not be located at the time the formal complaint was filed due to lapse of time. This witness was identified by Emil as Iris Derouen. Emil further testified that "I have the investigator here who conducted an extensive search for Iris Derouen." The Bar contends that Derouen was subsequently deposed by Emil's counsel but said deposition was not offered at trial by Emil, nor was she called as a live witness. The Bar has asked that Emil stipulate to this fact. There is no evidence that Emil had made such a stipulation. If it is true that Derouen was deposed prior to the hearing before the Tribunal, it may be implied that any information Derouen was able to give Emil was not crucial to his defense or he would have called her as a witness. Thus, there is no prejudice in respect to this witness.
Emil testified that there were five material witnesses to count three who could not be located. The record reflects that one of the witnesses was found. Nonetheless, this issue is moot. Emil has conceded that he committed professional misconduct with respect to count three of the formal complaint. Thus, there is no prejudice present.
There were two witnesses, according to Emil, who could not be located for information concerning count six. He identified them as John Skjefte and investigator Jacobs. Emil stated that the substance of Skjefte's testimony would have been that Emil had "never offered Skjefte anything." Emil did not disclose what type testimony he would elicit from Jacobs. The Bar contends that either testimony had it been offered would have been irrelevant. This may be true of Skjefte, but we do not know about Jacobs. We have no idea what his testimony would have been. However, this cannot be said to be prejudice in such an overwhelming fashion that it violates the substantive due process rights of Emil.
Regarding count seven, Emil submitted that four critical witnesses (Ella Mae Moran, Jadley Moran, Chancellor John Morris and attorney Tom Stennis) were unavailable to testify. However, Ella Mae Moran passed away in January 1986, more than two years prior to the filing of the informal complaint. Again, this cannot be prejudice as a result to the delay. Jadley Moran was declared non compos mentis in August 1987, prior to the filing of the informal complaint. Thus, his unavailability may not be traced to the delay in the proceedings. Chancellor Morris passed away at some undisclosed date.
Mr. Stennis passed away on June 1, 1991, some two and one-half (2 1/2) years after the investigatory hearing was held. Emil offered no reason why Mr. Stennis was not called as a witness at the investigatory hearing. Moreover, Emil did not offer any explanation as to the testimony or evidence Mr. *311 Stennis would have provided other than to state that Mr. Stennis knew "the work done on [the Moran case]" and was involved when the court approved the settlement and the expenses that were claimed to have been incurred in the presentation of that case by the attorneys. Again, Emil has failed to show a substantial amount of prejudice due to the delay in the proceedings which resulted in witnesses being lost.
Emil's second assertion of prejudice is that to his own physical and mental well-being and practice of law. It was Emil's testimony that his personal and economic situation had been damaged not only by the alleged delay, but also by the threats of the lawyers who filed the complaint. He testified that all of the following were a result of the delay:
(1) He started smoking again.
(2) He saw two psychiatrists because he wasn't getting business.
(3) He couldn't concentrate on a client or talk to one if one came to see him.
(4) He couldn't relate to his wife or two children.
(5) He became reclusive, easily agitated, and withdrew from civic, church and bar activities.
(6) He had been through a "living horror."
The Bar notes that Emil did not present any corroborating evidence or medical testimony in support of the aforementioned allegations.
Upon cross-examination, Emil testified that his personal income from the practice of law increased from a range of between seventy thousand dollars ($70,000) to one hundred thousand dollars ($100,000) in 1988 to approximately one-half million dollars ($500,000) in 1992. Emil continued and continues to practice law while this case awaits its final judgment. There has been no interruption to Emil's privilege to practice law since the date the original informal complaint was filed against him in 1988.
In an analogous case, we refused to find prejudice sufficient to dismiss the charges against an attorney. See Barrett v. The Mississippi Bar, 648 So.2d 1154 (Miss. 1995). In Barrett, the complaint was filed in 1982 and the merits of the case were not heard until 1991. Id. at 1155. This nine year delay is much longer, in fact over twice as long, as the delay in the present case. We held that this state does not "impose[] the same speedy trial requirements in disciplinary actions that it imposes in criminal cases." Id. at 1159. Thus, this Court looked to see if there was any prejudice that would justify dismissing the charges against Barrett. Barrett alleged that he was prejudiced because some material witnesses could not be located to be called for trial. Id. at 1160. We found that the nine year delay did not prejudice Barrett because there was no evidence in the record that the witnesses would have been called to testify or that they had any thing of value to add. Because there was no prejudice, we held that the speedy trial claim must fail. Id. The present case is analogous to Barrett. If anything, Barrett possibly had a better claim to a speedy trial violation than Emil does.
In The Mississippi Bar v. An Attorney, the Court held that there was no prejudice where the attorney continued to practice law throughout the duration of the proceedings. An Attorney, 636 So.2d at 374-75. This Court further held that the mere passage of time will not infer prejudice to the attorney. Id. Emil has offered no proof that he was prejudiced by the delay. We find no substantial amount of prejudice to justify dismissing the charges and therefore Emil's alleged error fails.
Emil also contends that the charges should be dropped due to the "Rule Time Constraint Delays." Rule 5 of the Mississippi Rules of Discipline affirmatively imposes upon the Bar the duty to expeditiously, timely, and speedily handle all complaints. Rule 5 provides in pertinent part as follows:
All proceedings under these rules shall be expeditiously conducted to the end that no complainant be deprived of his right to a timely, fair and proper investigation of a complaint and that no attorney be subjected to unfair and unjust charges.
Rules of Discipline, Rule 5. Emil contends that under Rule 5 the complaint and charges against him should be dismissed as untimely. However, we have reviewed this exact point *312 of law and found that Rule 5 is directory and not jurisdictional.
In The Mississippi Bar v. An Attorney, 636 So.2d 371 (Miss. 1994), this Court was faced with a situation identical to that presented it today. In An Attorney, the attorney contended that the "Mississippi Rules of Discipline expressly provide[d] that bar disciplinary proceedings be conducted in an expeditious manner. The attorney specifically cited ... Rule 5." Id. at 374. "We have held that the Rules of Discipline are directory rather than jurisdictional. See Myers v. Mississippi State Bar, 480 So.2d 1080, 1090 (Miss. 1985), cert. denied, 479 U.S. 813, 107 S.Ct. 64, 93 L.Ed.2d 23 (1986); Fougerousse v. Mississippi State Bar Association, 563 So.2d 1363 (Miss. 1990)." Id. (parallel citations omitted). Rule 26 of the Rules of Discipline states that "failure to observe directory time interval may result in contempt of the agency having jurisdiction but will not justify abatement of any disciplinary investigation or proceeding." Mississippi Rules of Discipline Rule 5 (emphasis added). Thus, under the Rules of Discipline themselves and our previous case law, this Court holds that the complaint should not be dismissed due to the time constraints imposed by the Rules of Discipline.
There has been no showing of an unconstitutional delay in the proceedings against Emil. Thus, this first assignment of error is without merit.

B. The motion to dismiss the complaint due to multiplicity.
At the Tribunal's hearing of the case on the merits, Emil raised a motion to quash the charges on grounds of multiplicity, but the motion was overruled. Emil contends that since disciplinary proceedings are inherently adversarial of a quasi-criminal nature, the formal complaint may be compared to an indictment in that it lists the various charges against the accused in a formal document.
Emil applies Miss. Code Ann. § 99-7-2 to the proceedings at hand. Miss. Code Ann. § 99-7-2 states that an indictment may charge two or more offenses only if the offenses are based on the same act or transaction or the offenses are based on two or more acts or transactions connected together or constituting pars of a common scheme or plan. Emil argues that this statute requires dismissal of the charges against him since all seven were joined in one formal complaint although they all are totally unrelated and are not alleged to be part of a common scheme or plan.
This Court has held that disciplinary proceedings are only quasi criminal and not criminal. See Alexander v. The Mississippi Bar, 651 So.2d 541, 546 (Miss. 1995); Harrison v. The Mississippi Bar, 637 So.2d 204, 218 (Miss. 1994); and Attorney K v. Mississippi State Bar Ass'n, 491 So.2d 220, 222 (Miss. 1986). Ergo, § 99-7-2 does not apply to the case sub judice. As previously discussed, this Court has also held that an attorney is not entitled to all those rights afforded a criminal defendant. See, e.g., Mississippi State Bar v. Young, 509 So.2d 210, 219 (Miss. 1987) (holding that an attorney is not entitled to a jury trial). It follows that the statute (and the only authority cited by Emil for this proposition) is inapplicable to the case at bar. This assignment of error is without merit and must fail.

C. The motion for separate trials on each unrelated count of the complaint.
Prior to the introduction of any evidence to the Tribunal, Emil moved for separate trials on the various unrelated counts on the ground that he would be prejudiced by the commingling of evidence from each count that would almost surely result if separate trials were not granted. The formal complaint contains seven counts of solicitation. However, all seven involve separate and distinct activities allegedly taking place over an eight year period extending from 1980 to early 1988.
Emil now changes his argument from one of a criminal nature to a civil nature. He relies upon Mississippi Rules of Civil Procedure to provide for the separation of trials in order to avoid prejudice to a party. M.R.C.P. Rule 42(b). Emil would have this Court apply the rights and procedure from a criminal trial and a civil trial. In essence, Emil would like any procedure that benefits him to be applied. We have held that the *313 Mississippi Rules of Civil Procedure do not govern a disciplinary proceeding, but are applicable where the Rules of Discipline are silent. Harrison v. The Mississippi Bar, 637 So.2d 204, 215 (Miss. 1994).
The Bar notes that Emil offers no authority or argument to support this allegation of error and that he has shown no prejudice by the counts all being tried together. Emil merely states that "the commingling of the evidence as mentioned above, could, and in fact did, cause prejudice to his case." We find this argument void of any merit and it fails.

II. WHETHER THE TRIBUNAL COMMITTED REVERSIBLE ERROR IN THEIR EVIDENTIARY RULINGS.
The four errors assigned by Emil in evidentiary rulings will be discussed separately.

A. Allowing the Mississippi Bar to introduce the deposition of Gwendolyn Catchings over the objection of Emil.
In the course of the hearing on the merits, the Tribunal allowed the Bar to introduce the testimony of Gwendolyn Catchings. The document offered into evidence by the Bar was the transcript of Catchings's testimony from the investigatory hearing in July 1989. Ergo, the statement was taken under oath and Emil had opportunity to cross-examine Catchings at that time. The Bar sought to present Catchings's testimony pursuant to Rule 32(a)(1) of the Mississippi Rules of Civil Procedure rather than calling her as a live witness. Further, the Bar argued that Catchings's testimony was admissible under subsection (a)(3)(B) of Rule 32 which states:
The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: ... that the witness is at a greater distance than one hundred miles from the place of trial or hearing, or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition.
M.R.C.P. Rule 32(a)(3)(B) (1995). The comment to Rule 32 states that:
Mississippi Rule of Evidence 804(b)(1) permits the introduction of the deposition testimony of an unavailable witness. Though the deposition of the unavailable witness need not have been taken in the same proceedings as that in which it is offered, the party against whom the deposition is offered ... must have had both an opportunity and a similar motive for cross-examination. See 4 J. Weinstein & Miss. Berger, Weinstein's Evidence ¶ 801(D)(01) [01] (1985).
M.R.C.P. Rule 32 cmt. (1995).
Emil argued below that Catchings's testimony was not admissible under Rule 32 and Rule 804. He contended that he did not have "a similar motive for cross-examination" when Catchings's testified at the investigatory hearing. The investigatory hearing was not an adversary proceeding and Emil argued that he would have conducted his cross-examination entirely differently had he known that the testimony was going to be admitted into evidence at the hearing on the merits. Emil objected to the use of the deposition testimony on the ground that there was no evidence presented before the Tribunal which would authorize the use of the deposition under the provisions of Rule 32(a)(3) or Rule 804(b)(1).
The question before this Court is whether the testimony was properly admitted under Rule 32(a) of the Mississippi Rules of Civil Procedure which refers to Rule 804(b)(1) of the Mississippi Rules of Evidence. The only reason that the testimony might be inadmissible under Rule 32 is that it is not a deposition, but earlier sworn testimony. This is a question of form over substance; it does not hinder the introduction of Catchings's testimony. The query then becomes whether it was properly admitted under Rule 804(b)(1) as an exception to hearsay.
Under Rule 804, this Court must first determine if Catchings was unavailable. This concept in relevant part is defined by Rule 804(a)(5) as being "absent from the hearing and the proponent of his statement has been unable to procure his attendance ... by process or other reasonable means." M.R.E. 804(a)(5) (1995). The proponent of the hearsay must carry the burden of proving unavailability. See Mitchell v. State, 572 *314 So.2d 865, 869 (Miss. 1990). "This Court has described this burden as that of a `diligent effort.' Stoop v. State, 531 So.2d 1215, 1220 (Miss. 1988)." Mitchell, 572 So.2d at 869. If this burden is met and unavailability is proven, the statements must still fit one of the hearsay exceptions in Rule 804(b) in order to be admitted into evidence. Id. Thus, the first step is to determine if Catchings was unavailable to testify at the hearing on the merits. Second, this Court must determine if it falls into an exception listed in subsection (b)(1).
Upon Emil's objection, the Tribunal requested the Bar to present testimony regarding its efforts to locate Catchings. The Bar stated that it called directory information to no avail. It contacted two attorneys with past connections with Catchings by telephone with no success. One of the attorneys stated that she had moved to California. The testimony also showed that an acquaintance of Catchings (Earline Mitchell) was called, and she said Catchings had moved to California "three or four years ago," but she didn't know her whereabouts. On cross-examination, the witnesses offered by the bar admitted that they didn't contact law enforcement personnel about Catchings's last known location, did not send a certified letter to her last known address, and, in fact, did not talk to Earline Mitchell about the witness's location until only two days before the date the testimony was attempted to be offered into evidence. It was further developed that the Bar had encountered problems several months before the hearing in locating the witness, but notwithstanding this knowledge, no further efforts were made to locate her until the waning days before the hearing, and no notice was given to Emil's attorneys that the Bar had not located her until only two days before the hearing.
It is a close call on whether or not the effort by the Bar constitutes a diligent effort. A review of the relevant case law provides a guideline for determining when a witness is unavailable. In Mitchell v. State, 572 So.2d 865 (Miss. 1990), this Court held that the prosecution had met its burden of proof and that the witness was unavailable. In an effort to locate the witness, the prosecution made the following "diligent efforts":
(1) Contact of the F.B.I. office in Jackson.
(2) Contact of the police department in Cleveland, Ohio.
(3) Contact of the welfare department in Cleveland, Ohio.
(4) Recent notification by [the witness] that he had no address or phone number and that he was living in the streets.
(5) Reports that [the witness] was periodically in Cleveland.
(6) A lack of friends or relatives, including a brother who served as a deputy sheriff, that knew of [the witness's] whereabouts.
(7) A one year search by Deputy Ellis that proved unsuccessful.
(8) Relatives in Cleveland who were contacted and stated that they did not know of [the witness's] location.
(9) Strong resistance by [the witness] when asked to reveal his location.
Mitchell, 572 So.2d at 869. The Bar's attempts to locate Catchings come nowhere near the efforts in the Mitchell case.
In Stoop v. State, 531 So.2d 1215 (Miss. 1988), the prosecution sought to introduce the transcript of one of its witnesses from a previous trial in the same case at the retrial of Stoop. In an effort to locate the witness, a subpoena was issued, but not to the witness's current residence. A call was made to the witness's estranged husband, but he was out-of-town and the prosecution never called back. Instead they called the witness's friend who told them she did not know where the witness was. Stoop, 531 So.2d at 1220. Although the estranged husband knew of the witness's whereabouts, the prosecution never found out because it was satisfied with the effort in calling the witness's friend. This Court held that the prosecution had not made a diligent effort to locate the witness, and therefore, the requirement of unavailability was not met. Id. The Bar did not even make the efforts made in Stoop. In Stoop a subpoena was issued even though it was no longer the current address. Id. The Bar did not ever contact law enforcement officers or attempt to obtain a subpoena.
In the final analysis, the Bar neither made a credible showing that the witness was unavailable *315 nor showed that she was out of state or located further than 100 miles from the hearing site. The evidence offered by the Bar totally failed to establish that the witness was unavailable for Rule 804(a)(5) and (b)(1) purposes, or that her deposition testimony was available for use under Rule 32(a)(3). Therefore, we find that the Tribunal erroneously admitted Catchings's testimony.

B. Allowing the introduction of hearsay out-of-court statements of Albert Fountain for the purpose of proving the existence of agency between Fountain and Emil.

C. Allowing the following witnesses called by the Bar to testify to hearsay statements of Albert Fountain: Gwendolyn Catchings, Donald Bourgeois, Otis Kaufman, and Peter Quave.
Subsections (B) and (C) shall be addressed together because they are essentially the same argument. Emil contends that it was error for the Tribunal to allow hearsay testimony about what Fountain said. The out-of-court statements of Fountain were introduced through the testimony of Catchings, Donald Bourgeois, Otis Kaufman, and Peter Quave. This issue is moot as to Catchings's testimony because we find it to be inadmissable. Emil asserts that none of these statements should have been allowed into evidence. The Tribunal ruled that the statements were admissible under rule 801(d)(2)(C) and (D) of the Mississippi Rules of Evidence because the statements were made by a party opponent. Rule 801(d)(2)(C) and (D) reads in pertinent part as follows:
(d) Statements Which Are Not Hearsay.
A statement is not hearsay if:
(2) Admission by Party-Opponent. The statement is offered against a party and is ... (C) a statement made by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship.
M.R.E. Rule 801(d)(2)(C) and (D) (1995). The comment to Rule 801(d)(2)(C) and (D) read as follows:
(C) The general principle survives that a statement by an agent authorized to speak by a party is tantamount to an admission by a party. The rule covers statements made by the agent to third persons as well as statements made by the agent to the principal. The essence of this is that a party's own records are admissible against him, even where there has been no intent to disclose the information therein to third persons.
(D) The common law required that the agent's statement be uttered as part of his duties, i.e., within the scope of his agency. 801(d)(2)(D) regards this rigid requirement and admits a statement "concerning a matter within the scope of his agency" provided it was uttered during the existence of the employment relationship.
Rule 801(d)(2) cmt. (1995) (emphasis in original). The rule and comment provide that the statements of an agent may be admitted under certain circumstances. However, the first question that must be answered is whether the Bar proved that Fountain was Emil's agent in order to have the statements admitted under a theory of agency.
An agent is "[a] person authorized by another (principal) to act for or in place of him; one intrusted with another's business... . A business representative, whose function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between principal and third persons." BLACK'S LAW DICTIONARY 63 (6th ed. 1990). "[T]he burden of proving an agency relationship is upon the party asserting it." Ciba-Geigy Corp. v. Murphree, 653 So.2d 857, 872 (Miss. 1994) (citations omitted). Emil makes the blanket assertion that "[t]he Bar totally failed to establish the relationship between Fountain and Emil necessary to constitute Fountain's alleged solicitation efforts an admissible admission under Rule 801(d)(2)(C) or (D), M.R.E." The Bar counters that it proved agency through Fountain's own testimony. Emil did point to a few specific facts he believed supported the claim that Fountain was not an agent of Emil's. Emil contends *316 that Fountain was not his agent and points to the following facts to support his contention:
(1) Fountain was a self-employed investigator.
(2) Fountain worked for a number of lawyers in 1984.
(3) Fountain listed Emil's office number as his own for only a short time, and that was after the dates in the formal complaint except possibly count seven.
(4) Moran first contacted Fountain, not vice versa.
(5) Fountain never worked out of Emil's office building.
(6) Bourgeois' mother asked Fountain's niece to ask him to go see Bourgeois.
(7) Fountain did not tell Bourgeois that he was visiting him on behalf of any law firm.
(8) Catchings instigated the contact between herself and Fountain.
(9) Fountain was never employed as a regular employee for Emil, but worked on a case by case basis.
(10) Emil knew nothing about Fountain's contacts with Bourgeois, and Catchings and Fountain never mentioned it to Emil until two years later.
The Bar points to the following facts to support its assertion that Fountain was Emil's agent:
(1) Fountain had no name for his investigative business.
(2) He started his investigative business in the early 1980's.
(3) He performed investigative work for various lawyers including Emil during 1984.
(4) He used a business card for his investigative business that had Emil's office telephone number on it.
(5) Fountain had a sign outside of Emil's office building that advertised Fountain's investigative services.
(6) Fountain's relationship with Emil changed in 1988.
(7) Fountain did investigate work for Emil in 1984, 1985, 1986, 1987 and 1988.
(8) Fountain received approximately $18,430.00 from Emil in 1988.
(9) Fountain listed Emil's name and address on Schedule C of his 1988 income tax return as being his employer.
(10) Fountain listed Emil's employer identification number as being his employer's identification number on Schedule C.
(11) Fountain didn't know if he worked for any law firm other than Emil in 1988.
(12) Fountain did not receive any Form 1099's from any law firm in 1987.
(13) Fountain received $1,525.00 from Emil for working on the Rudy Moran case in 1984.
(14) Fountain referred Rudy Moran's brother, Roland Moran, to Emil after the accident.
(15) Fountain was compensated for the work he performed on the Moran case at a rate different than what he testified to.
(16) Fountain investigated the Bourgeois cases on his own, but he tried to get Bourgeois to call Emil for Emil to represent him.
(17) Fountain didn't know Bourgeois when he went to see him in the hospital.
(18) Fountain denied that he recommended Emil to Bourgeois, but Bourgeois testified that he did.
(19) Fountain had conversations with Ms. Catchings, whose interest were adverse to Don Bourgeois.
(20) Emil asked Fountain to go see William Buckley in January of 1986.
(21) Emil employed Fountain to render investigative services for all clients listed on Exhibit 15 except Moran.
(22) Fountain told Quave that he made between $80,000.00 and $100,000.00 from working for Emil but said he was "joking around" and that such statement wasn't true.

*317 (23) Exhibit 14 reflects that Emil paid Fountain $1,525.00 in 1984, $500.00 in 1985, and $2,403.34 in 1987, and Exhibit 16 shows that in 1988, Emil paid Fountain $7,048.00 for work on twenty-three (23) cases. (Fountain's income tax return, Schedule C, for 1988 reflects that he received $18,430.00 from Emil instead of the aforesaid $7,048.00). Emil paid Fountain $4,920 in 1984, $963.00 in 1985, and $2,888 in 1987.
(24) A significant portion of Fountain's income from 1984-1988 came from doing investigative work for Emil.
Based upon the testimony of Fountain, the Tribunal held that a principal/agent relationship existed between Emil and Fountain. In First Jackson Securities Corp. v. B.F. Goodrich Co., 253 Miss. 519, 176 So.2d 272 (1965), this Court held that:
An agent is one who acts for or in the place of another by authority from him; one who undertakes to transact some business or manage some affairs for another by an authority and on account of the latter, and to render an account of it. He is a substitute, a deputy, appointed by the principal, with power to do the things which the principal may or can do.
The most characteristic feature of an agent's employment, is that he is employed primarily to bring about business relations between his principal and third persons, and this power is perhaps the most distinctive mark on the agent as contrasted with others, not agents, who act in representative capacities.
Id. 176 So.2d at 278 (quoting 2 C.J.S. Agency § 1 c., p. 1024 (1936))(emphasis added). It is a fact question as to whether the testimony showed that an agent/principal relationship existed between Emil and Fountain. There was ample testimony that Fountain had the "characteristic feature" of an agent. His job was to find prospective clients for Emil.
The Bar called Fountain as its first witness and after establishing an agency relationship called further witnesses from whom it elicited testimony concerning Fountain's actions and statements pursuant to Rule 801(d)(2)(D). This is the proper procedure to be followed under the Mississippi Rules of Evidence in order to have the testimony admitted. There was no error by the Tribunal in allowing the introduction of Fountain's statements through the hearsay testimony of Donald Bourgeois, Otis Kaufman, and Peter Quave.

D. Allowing the testimony of Roger Wilder when said witness had not been previously disclosed pursuant to Emil's discovery requests.
Roger Wilder was called upon to testify during the Bar's rebuttal case. He testified as to Emil's general reputation as to truth and veracity in the community. Emil propounded nineteen interrogatories to the Bar pursuant to Rule 33 of the Mississippi Rules of Civil Procedure. Interrogatory No. 5 requested the names and addresses "of each and every person who has discoverable knowledge of the allegations." In its initial response, the Bar responded with a list of approximately 20-22 names. Later, the Bar supplemented these answers with another list of four names. Nowhere in any of the responses to the interrogatories or in any other discovery disclosure in the course of this case did the Bar disclose that Wilder was a person responsive to Interrogatory No. 5 or that might be called as a prospective witness. When Wilder was called to testify during the Bar's rebuttal, Emil objected on the ground that he had not been identified pursuant to Emil's Interrogatory No. 5. The Bar contended that the purpose for calling Wilder was for rebuttal and aggravation. The Tribunal overruled Emil's objection stating that the Bar was not required to disclose Wilder's identity "if the purported testimony of this witness is as counsel of the Bar states it is to be."
The question before this Court is whether the Bar had a duty to disclose Wilder to Emil in the first place. Emil cites to Harris v. General Host Corp., 503 So.2d 795 (Miss. 1986) in support of his argument that the Bar had such a duty. Emil directs this Court to the following portion of the Harris opinion:
We have effectively dispatched the "rebuttal witness" ruse for non-disclosure of witnesses in the context of criminal cases. *318 Coates v. State, 495 So.2d 464, 466 (Miss. 1986); Johnson v. State, 491 So.2d 834, 836-37 (Miss. 1986); Tolbert v. State, 441 So.2d 1374, 1375 (Miss. 1983). We ascertain no reason on principle why we should credit such a ploy in the context of a civil action.
Harris, 503 So.2d at 797. It is Emil's contention that this case squarely controls the case at hand, and thus, the Tribunal erred in allowing Wilder to testify. We agree.
In Harris, the defense called an expert witness in their case-in-chief that had not been disclosed during discovery. Harris, 503 So.2d at 796. The plaintiff immediately objected and the court allowed the testimony anyway. The court held that the expert witness was a "rebuttal witness" and therefore, the defense had no obligation to testify. Thus, the testimony was allowed. Id. This Court, on appeal, held that the defense's claim that the witness was a rebuttal witness "profits it nothing. There is nothing in our rules of procedure that authorizes a party to withhold the names of likely expert witnesses on such grounds, except only for the circumstance where the party had no reasonable means of anticipating in advance of trial the need for calling the witness." Id. at 797.
The Bar would distinguish this case on the facts. It notes that the interrogatory asked for the disclosure of expert witnesses, not the general interrogatory of any person with knowledge. Harris, 503 So.2d at 797. Further, the Bar notes that the witness in the Harris case actually testified for the defense during their case-in-chief. The Bar relies upon this Court's interpretation that the witness was no more a rebuttal witness than any other witness who testified different from other witnesses (the "ruse" this Court referred to in its holding).
The Bar is correct in its distinctions. However, this does not mean that it did not have to disclose a witness that it planned to call for testimony concerning truth and veracity of Emil. Furthermore, this Court held in Harris that:
We have long been committed to the proposition that trial by ambush should be abolished, the experienced lawyer's nostalgia to the contrary notwithstanding. We have sought procedural justice through a set of rules designed to assure to the maximum extent practicable that cases are decided on their merits, not the fact that one party calls a surprise witness and catches the other with his pants down. One of the most obviously desirable and rigidly enforced of these rules is that requiring pretrial disclosure of witnesses.
Harris, 503 So.2d at 796-97. The Bar had a duty to disclose its witnesses that it was going to call and those it may call during trial. To guise them as "rebuttal witnesses" does not remove them from the requirements of this Court and rules of procedure.
The Bar relies upon Kern v. Gulf Coast Nursing Home of Moss Point, 502 So.2d 1198 (Miss. 1987) which can be distinguished. In Kern, witnesses that were not disclosed were called in the case-in-chief. The lower court held that because they had not been disclosed they could only be called on rebuttal, not because that was allowable, but to give the opposing side time to prepare. This Court held that the lower court did not abuse its discretion in denying sanctions. Kern, 502 So.2d at 1200. This is not the situation that we have here. The Bar attempted to call for the first time on rebuttal a witness that had not been disclosed during discovery. We find that there is a distinction.
Rule 26(b)(1) of the Mississippi Rules of Civil Procedure states that a party may obtain discovery which includes "the identity and location of persons ... having knowledge of any discoverable matter." M.R.C.P. Rule 26(b)(1) (1995). This rule imposes a duty upon the Bar to disclose Wilder. The Bar did have such a duty and that the Tribunal erred in allowing Wilder to testify as a rebuttal witness.
Nonetheless, the Bar submits that said error is harmless. Wilder and Chancellor Randall testified about Emil's reputation for truth and veracity in the community in which he lives and practices law. Both said it was bad. There was no objection to Randall's testimony at the hearing, nor is it appealed now. Thus, Randall's testimony (although improperly admitted) now renders Wilder's cumulative. Moreover, the Bar notes that the Tribunal relied upon Randall's testimony in determining Emil's character and reputation. *319 In its opinion and judgment, the Tribunal found the following:

(g) Character and reputation His reputation for truth and
 veracity in the community in
 which he lives is bad. Indeed,
 it is a sad day when your
 local chancellor, not knowing
 you personally, knows that
 your reputation in the
 community for truth and
 veracity is bad.

Emil notes in his reply brief that it is difficult to consider Wilder's testimony cumulative or harmless error. Randall and Wilder were the Bar's witnesses as to the truth and veracity of Emil. Emil presented testimony from four persons who would vouch for his truthfulness and honesty. It is not as if Wilder were one of many, but he is one of two. So, it is difficult for us to say that the admission of his testimony was harmless error. Emil also notes that he submitted letters of recommendation from two other chancery court judges who are both senior to Randall. Therefore, either Randall's testimony has a tremendous amount of weight, or the Tribunal relied upon Randall's testimony because it was bolstered by Wilder's. In the end, we cannot say with all confidence that the testimony of Wilder was cumulative and therefore harmless.

III. WHETHER THE EVIDENCE PRESENTED IN SUPPORT OF COUNTS ONE, TWO, FIVE, SIX, AND SEVEN MET THE CLEAR AND CONVINCING BURDEN OF PROOF REQUIRED FOR FINDINGS OF VIOLATION OF THE DISCIPLINARY RULES OF THE MISSISSIPPI BAR.
In order to find Emil guilty of any ethical violation, the Bar must meet the required burden of proof which is presenting their case by clear and convincing evidence. Alexander v. The Mississippi Bar, 651 So.2d 541, 546 (Miss. 1995)(citing Attorney W.L. v. The Mississippi Bar, 621 So.2d 235 (Miss. 1993)); Attorney BT v. The Mississippi Bar, 589 So.2d 119, 121 (Miss. 1991); The Mississippi State Bar v. Varnado, 557 So.2d 558, 559 (Miss. 1990); Vining v. Mississippi State Bar Ass'n, 508 So.2d 1047, 1048 (Miss. 1987); An Attorney v. The Mississippi State Bar, 478 So.2d 289, 291 (Miss. 1985); Netterville v. The Mississippi State Bar, 397 So.2d 878, 884 (Miss. 1981).
Emil contends that the Bar did not meet this requisite burden of proof on five counts (counts 1, 2, 5, 6, and 7). In counts one and two, Emil was charged with violating the provisions of DR2-103(A) and DR1-102(A)(2), Mississippi's Code of Professional Responsibility, which in essence, involve the use of a runner in an effort to secure business for himself. Counts five and six charge Emil with violating Rules 5.4(a), 7.2(c), and 8.4(a), Mississippi Rules of Professional Conduct, which prohibit a lawyer from giving or attempting to share legal fees or give anything of value to a person for recommending Emil to a new client. The last count Emil challenges, count seven, charges Emil with a violation of DR1-102(A)(5) and (6), DR3-102, Mississippi Code of Professional Responsibility, and Rule 5.4(a), Mississippi Rules of Professional Conduct, which prohibit a lawyer from sharing legal fees with a non-lawyer and engaging in conduct that is prejudicial to the administration of justice. Counts one and two shall be discussed together because the evidence is substantially the same for each count. Otherwise, each count shall be discussed separately to determine if the Bar met the burden of clear and convincing evidence.

COUNTS ONE AND TWO

Statement of Facts
Count one alleges conduct that occurred in September of 1986. During the first week of September 1986, Catchings's mother was in an automobile accident. The other car in the accident was driven by Donald Joseph Bourgeois. Both parties were taken to Biloxi Regional Medical Center and treated for their injuries. Catchings's mother was treated and released. However, two days later she was readmitted and later died.
Catchings's testimony that was erroneously admitted provided most of the facts on count one. However, some of the facts came from other witnesses such as Fountain. Sometime between the accident and Catchings's mother's death, Catchings hired the law firm of Sherry and Halat to handle any matters pertaining to the accident or death of her mother. It was alleged that Fountain solicited Catchings's mother to have Emil *320 represent her. He presented her with his card. Fountain's business card reflects that he did personal injury investigations, had twelve years of law enforcement experience and was located at 206 Batty Avenue, Biloxi, Mississippi, 39832, and that his residence telephone number was XXX-XXX-XXXX and that his office telephone number was XXX-XXX-XXXX. The telephone number listed as Fountain's office number was the telephone number for Emil's law office. Fountain only used Emil's telephone number on his business card for a short period of time in 1986.
Count two also alleges conduct involving the accident between Bourgeois and Catchings mother. While hospitalized, Bourgeois was contacted by Fountain. At the time of Fountain's visit with Bourgeois, Fountain had not been contacted by Bourgeois or by anyone acting on Bourgeois's behalf for the purpose of asking Fountain to meet with Bourgeois.
During the meeting with Bourgeois, Fountain told him that he was an investigator with Emil's law firm, and that the law firm had recovered large sums of money for different people and that Bourgeois should hire Emil to represent him concerning any claim Bourgeois may have as the result of being involved in the accident. Bourgeois informed Fountain that he did not need a lawyer. Fountain, nevertheless, took pictures of Bourgeois in the hospital room with Bourgeois's permission and told him that the pictures were necessary in the event he decided in the future to hire Emil. The Bar asserts that Fountain even had Bourgeois put on a neck brace when some of the pictures were taken.
Following Bourgeois' release from the hospital, Fountain again contacted him without being requested to do so by Bourgeois and inquired if he had decided on getting an attorney. At this time Bourgeois had not sought Fountain's advice or Emil's advice regarding the employment of a lawyer.

Legal Discussion
Because this Court determined that Catchings's testimony was erroneously admitted, whether Emil committed the acts alleged in count one becomes less certain. Nonetheless, count two is still valid and therefore, this court will not discuss whether Emil is guilty of count one. He is guilty of count two as the following discussion will prove.
All of the activities of Fountain as testified to in support of count two occurred in September 1986. Thus, the Mississippi Code of Professional Responsibility governed attorney conduct at that time. Emil is charged with violating DR2-103(A) and DR1-102(A)(2). DR2-103(A) of the Mississippi Code of Professional Responsibility provides:
A lawyer shall not, except as authorized in DR2-101, recommend employment as a private practitioner, of himself, his partner, or associate to a layperson who has not sought his advice regarding employment of a lawyer.
M.C.P.R. DR2-103(A) (1986). DR1-102(A)(2) of the Mississippi Code of Professional Responsibility provides that "[a] lawyer shall not [c]ircumvent a Disciplinary Rule through actions of another." M.C.P.R. DR1-102(A)(2) (1986).
Emil asserts that the Bar must prove that Emil violated these provisions by one of three ways: (1) that Emil directed or ordered Fountain to make contact with Bourgeois for the purpose of recommending that they hire Emil, (2) that Emil knew that Fountain made such contacts and subsequently ratified Fountain's conduct, or (3) that Emil personally solicited the case. The Bar concedes that Emil did not personally solicit business from Bourgeois. However, the Bar contends that Emil indirectly solicited Bourgeois and that that is sufficient to meet its burden of proof.
Emil cites no authority for his three propositions of meeting the burden of proof. However, the Bar points us to two cases from this Court holding that indirect, personal solicitation is as much a violation of the rules of professional conduct as is direct, personal solicitation. See Mississippi State Bar v. An Attorney: L, 551 So.2d 129 (Miss. 1989); and Mississippi State Bar v. Moyo, 525 So.2d 1289 (Miss. 1988). However, these two cases do not actually support the Bar's contention.
*321 Emil notes that the only way the testimony can be offered and the only theory that supports the claim that Emil violated these ethical codes is that Fountain was his agent. We find however that the agency was proved by the Bar between Emil and Fountain and that Fountain was Emil's agent.
Emil was charged with recommending employment to someone who has not sought his advice regarding employment as a lawyer and with violating this rule through the actions of another. In regards to count two certain facts seem to be uncontested. First, the fact that Bourgeois did not seek Fountain's advice regarding employment of a lawyer. Bourgeois said he did not need one. Secondly, Fountain went to visit Bourgeois with the intent to recommend Emil as a private practitioner. Ergo, Emil has violated DR2-103(A) through the actions of another which violates DR1-102(A)(2). The Bar provided sufficient evidence to find Emil in violation of these two sections of the Mississippi Code of Professional Responsibility as to count two.

COUNT FIVE

Statement of Facts
Between March 5 and April 11, 1988, Otis Kaufman, a Mississippi Highway Safety Patrolman, stationed in Harrison County, Mississippi was contacted by Fountain and requested to refer potential personal injury cases arising from automobile accidents to him. During this conversation, Fountain told Kaufman that Emil paid him fifteen percent (15%) of settlement proceeds from each case that was referred to Emil and that he (Fountain) made approximately $80,000 the previous year. Further, Fountain told Kaufman that he would give Kaufman half of the fees paid him by Emil if Kaufman would refer cases to him so that he could, in turn, refer the cases to Emil. Kaufman declined Fountain's offer.

Legal Discussion
Emil is charged with violating Rules 5.4(a), 7.2(c), and 8.4(a) of the Mississippi Rules of Professional Conduct in count five. Rule 5.4(a) states that "[a] lawyer or law firm shall not share legal fees with a nonlawyer." M.R.P.C. Rule 5.4(a) (1995). Rule 7.2(c) states that "[a]ll advertisements and written communications pursuant to these Rules shall include the name of at least one lawyer or the lawyer referral service responsible for their content." M.R.P.C. Rule 7.2(c) (1995). Rule 8.4(a) states that "[i]t is professional misconduct for a lawyer to ... violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another." M.R.P.C. Rule 8.4(a) (1995).
Emil contends that the Bar must prove one of the following by clear and convincing evidence to support the allegations made in the formal complaint: (1) that Emil shared legal fees with a non-lawyer or attempted to share legal fees with a non-lawyer through the acts of Fountain; or (2) that Emil gave something of value to Fountain or Kaufman for recommending his professional services; or attempted to give something of value to Fountain or Kaufman for recommending his services as a lawyer through the acts of Fountain. Emil further argues that he never actually shared legal fees or gave anything of value to anyone for recommending him to persons. Moreover, he returns to the same argument throughout that the only evidence supporting any of these claims is the hearsay evidence of Fountain which was improperly admitted. We have determined that the hearsay statements were not improperly admitted, so there is no merit to any of Emil's arguments.
Count five is a swearing match and the issue is one of credibility. The credibility issue is for the Tribunal and we give deference to them on a matter like credibility. We have held that:
[w]hile the review of evidence is de novo, deference is given to the Tribunal's findings due to its exclusive opportunity to observe the demeanor and attitude of the witnesses, including the attorney, which is vital in weighing the evidence. Broome v. Mississippi Bar, 603 So.2d 349, 353 (Miss. 1992); Mississippi State Bar v. Strickland, 492 So.2d 567 (Miss. 1986).
Mississippi Bar v. Mathis, 620 So.2d 1213, 1219 (Miss. 1993). We cannot say that the *322 Tribunal erred in believing the testimony of Officer Kaufman. If that testimony is true, then Emil is guilty of violating the rules charged in the formal complaint and therefore, it was not error to a judge Emil guilty as to count five.

COUNT SIX

Statement of Facts
Count six charged Emil with personally violating the Disciplinary Rules cited therein. The evidence before the Tribunal, as to count six, consisted solely of the testimony of Greg Rollison and the testimony of Emil. The testimony is in direct conflict.
Rollison says that Emil contacted him in early March 1988 at a time when he was still being represented by Emil and requested him to refer cases to him for pay. Emil testified that he never made any such requests of Rollison and that in March 1988 Rollison was not a client of his.
Emil says that Rollison fired him as his attorney in January 1988, some two months before he testified that the reported conduct occurred. Emil further says that at that time Rollison threatened to "get" Emil because Rollison did not receive any funds from his third-party settlement effected by Emil in December 1993.
Emil's testimony is conflicting at best. He first says that a third party settlement was made by him on Rollison's behalf in December 1993, and then says that he and Rollison had terminated their attorney-client relationship by no later than sometime in January 1988. Rollison testified that he and Emil still had an attorney-client relationship during March 1988. Regardless of when the attorney-client relationship ended, it was definitely before December 1993. The third party settlement claimed to by Mr. Emil becomes a puzzlement. Whether or not Emil and Rollison were in an attorney-client relationship during the period of the alleged incident is of no consequence. If Emil actually made the offer to Rollison, then he is guilty of an ethical violation.

Legal Discussion
In count six, Emil is charged again with violating Rules 5.4(a), 7.2(c), and 8.4(a), which prohibit the sharing of legal fees with a nonlawyer whether directly or through the actions of another.
Emil's entire argument against the allegations in count six is as follows:
Emil respectfully submits that taking into consideration Rollison's motive for revenge and his misstatement of the existence of an attorney-client relationship in March 1988 should have been enough alone for the Tribunal to conclude that the Bar did not prove by clear and convincing evidence that respondent violated any of the provisions of the Mississippi Rules of Professional Conduct as charged in Count Six. Therefore, the finding of the Tribunal should be set aside as to Emil's violation of the Disciplinary Rules.
Emil offers no evidence that Rollison had this motive for revenge and the Bar argues that it was Emil who had that motive. The Bar points to Rollison's testimony that when he indicated to Emil he wanted his file, Emil told him that he "would be sorry that (he) left and all that." This testimony was not rebutted by Mr. Emil when he testified.
Again we are faced with a swearing match as to whether or not Emil asked Rollison to refer cases for a part of the fee. In light of Mathis, 620 So.2d at 1219 we defer to the Tribunal's finding.

COUNT SEVEN

Statement of Facts
On September 28, 1984, Emil was hired to represent James R. Moran against General Motors Corporation for injuries arising out of an automobile accident which occurred on September 21, 1984, in which Moran was injured. Moran died on October 6, 1984, as a result of the injuries sustained in the said accident. Thereafter, the wrongful death beneficiaries of Moran employed Emil to represent them in their claim for the wrongful death of Moran.
Subsequent to Emil's employment, he associated the law firm of Denton, Dornan and Bilbo to assist him in the prosecution of the case. Subsequent to Emil's association of the Denton law firm, Don Dornan, a member *323 of that law firm, associated a Birmingham, Alabama law firm to assist in the prosecution of the claim.
In March 1987, General Motors agreed to settle the claim for the total sum of $675,000. On August 28, 1987, the Chancery Court of the Second Judicial District of Harrison County, Mississippi, acting by and through the Honorable John S. Morris, Chancellor, approved the settlement and the payment of attorneys' fees and reimbursement of expenses incurred by the attorneys in the prosecution of the claim, including a payment to Emil in the amount of $5,883.88 for expenses incurred by him. This included payment of bills that Fountain incurred in the investigation of the occurrence. This alleged bill included some $2,400 for rental cars used by Fountain and Moran's family members to travel to Baton Rouge, Louisiana, and to use in Moran's funeral. The hourly charges on Fountain's tardily prepared "bill" differed from his sworn testimonial hourly rate. The Moran clients were advised of the amount of Fountain's investigation charges and specifically authorized payment. The petition for the distributions and the order of distribution were both approved by Attorneys Denton and Dornan without objection.
Attorneys Denton and Dornan testified that prior to the distribution of the settlement proceeds, Emil told each of them that he needed to collect ten percent (10%) of the fee from them for the purpose of paying Fountain for obtaining the Moran case for him. Peter Quave, an investigator and insurance specialist with Attorney Denton, testified that in December 1986, Fountain told him that he made $100,000 a year working for Emil. Emil and Fountain testified that neither of them made the statements attributed to them by Denton, Dornan, and Quave.

Legal Discussion
In count seven, the formal complaint charged Emil with violating Rule 5.4(a) of the Mississippi Rules of Professional Conduct[1], DR3-102 of the Mississippi Code of Professional Responsibility, and DR1-102(A)(5)(6) of the Mississippi Code of Professional Responsibility. Again these provisions prohibit lawyers from sharing legal fees with nonlawyers or engaging in conduct that is prejudicial to the administration of justice or that adversely reflects on his fitness to practice law.
DR3-102 of the Mississippi Code of Professional Responsibility reads as follows:
DR 3-102. Dividing Legal Fees With a Non-Lawyer
(A) A lawyer or law firm shall not share legal fees with a non-lawyer, except that:
(1) An agreement by a lawyer with his firm partner, or associate may provide for the payment of money, over a reasonable period of time after his death, to his estate or to one or more specified persons.
(2) A lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that proportion of the total compensation which fairly represents the services rendered by the deceased lawyer.
(3) A lawyer or law firm may include non-lawyer employees in a retirement plan, even though the plan is based in whole or in part on a profit sharing arrangement.
M.C.P.R., DR3-102 (1986). DR1-102(A)(5) and (6) read as follows:
(A) A lawyer shall not:
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
M.C.P.R., DR1-102(A)(5) and (6) (1986). In order for the Tribunal to find Emil guilty of violating DR1-102(A)(5) and (6), it must first find that Emil violated DR 3-102. The initial question is whether Emil shared his legal fees in violation of the Mississippi Code of Professional Responsibility.
Emil responds with a blanket assertion that there was no testimony that he shared any of his legal fees from the Moran case with Fountain. The Bar's contention is that the question becomes "Who do you believe  *324 Denton, Dornan, and Quave, or Emil and Fountain? Denton, Dornan, and Quave testified that Emil asked them for a percentage of the settlement in order to pay Fountain. Moreover, Fountain submitted his bill and was paid from the settlement. Accepting the Tribunal's findings of fact, Emil's actions were clearly sharing legal fees with a non-lawyer. We cannot submit that the Tribunal erred in its holding that Emil was guilty of count seven in the formal complaint.

IV. WHETHER THE COMPLAINT TRIBUNAL ERRED IN BASING ITS RULINGS ON PUNISHMENT IN PART ON EVIDENCE PRESENTED TO THE SAME COMPLAINT TRIBUNAL IN AN UNRELATED TRIAL OF A FORMAL COMPLAINT FILED AGAINST EMIL BY THE MISSISSIPPI BAR.
Emil contends that the Tribunal erred when it considered a prior disciplinary matter concerning Emil when it determined the sanction for Emil. The Tribunal relied upon a factor of Emil's prior disciplinary record under ABA Standard 9.2 of Standards for Imposing Lawyer Sanctions (1991 ed.). The Tribunal looks to aggravating and mitigating circumstances when determining the sanction to be imposed upon the lawyer. Under aggravating circumstances the Tribunal included the following:

 1. 9.2 Aggravation  9.22 Factors which may be considered in
 aggravation. Aggravating factors include:
 ABA Standards Gerald R. Emil
(a) prior disciplinary offenses; In MSB v. Emil, No. 92-B-630,
 the Tribunal elected not to
 impose sanctions for interim
 financial assistance.
 Inexplicably, the complaining
 witnesses completely reversed
 their former statements on
 trial, completely negating any
 connection between Mr.
 Fountain and Respondent. This
 highly suspicious action
 remains unexplained.

Emil notes that this matter was not before the present Tribunal.
Disciplinary proceedings are inherently adversarial proceedings of a quasi-criminal nature. Thus, Emil contends that the prior disciplinary hearing may not be introduced into this hearing. He then argues that if the prior hearing is considered a conviction rather than acts of misconduct, it still cannot be admitted because it is not a final judgment. Regardless, of either of these arguments, this Court reviews the matter de novo and may consider the prior disciplinary proceeding because it is a final judgment having been handed down from this Court.
The Bar notes that Emil injected the previous matter into the present hearing himself. When asked "Have you ever received from the Mississippi State Bar or a Complaint Tribunal any adverse decision concerning your practice of law or conduct in practicing law?" Emil revealed the informal admonition imposed upon him in Cause No. 92-B-630. Emil effectively waived his objection to this point when he himself introduced the evidence.
The Tribunal correctly considered prior disciplinary offenses in its aggravating circumstances. We do not allow an attorney to continuously violate our rules and code of ethics without the repercussions becoming more serious each time. Also, Emil waived any objection when he himself introduced it by his testimony. There is no error in the Tribunal considering Emil's prior disciplinary record.

V. WHETHER THE COMPLAINT TRIBUNAL ERRED IN BASING ITS RULINGS ON PUNISHMENT IN PART ON TESTIMONY OF WITNESS GRABEN CONCERNING AN ALLEGED OBSTRUCTION OF JUSTICE ACT BY EMIL WITHOUT PRIOR NOTICE TO EMIL.
Another factor the Tribunal considered in aggravation was the obstruction of justice by Emil. The opinion and judgment concerning this matter reads as follows:

(e) bad faith obstruction of the No. However, and although not
disciplinary process by charged in the formal
intentionally failing to comply complaint, the peripheral
with rules orders of the testimony of process server,
disciplinary process; Joe Graben, relating to Emil's
 actions in attempting to
 circumvent Graben's efforts in
 serving a witness subpoena on
 E.M. Buckley to appear
 personally before this
 Tribunal is quite disturbing.
 To this Tribunal, it tends to
 show Emil's general attitudes
 towards the disciplinary
 process.

This aggravating factor is a result of attempting to locate a witness with knowledge about count three. Emil has conceded his misconduct as proven by his testimony as follows:

*325 Q: (By Mr. Liston) Did you ask Ruby Trahan to do anything?
A: Yes. Ruby Trahan worked with William Buckley and wanted me to be involved to investigate to see what could be done. I sent Fountain to the hospital with Ruby Trahan. And after that you've heard what Ms. Buckley said. I want to say this.
Q: Excuse me, let me ask you a question. What did you tell Fountain to do?
A: I told Fountain if he could, to go down to find out what happened, to see if he could render assistance. In retrospect, in looking at rule 7.3  first of all, I want to address two Rules if I could. 7.3, I have read 7.3. That says an attorney shall not solicit unless there's a family relationship. The way I read that is if a member of the family has asked you to do something then you should do it. You have an ethical duty to go to try to render assistance as an attorney. I misread that rule. And, in reading it again, the fact that E.M. Buckley was a natural uncle of Billy Buckley should have  was not enough reason to send someone over to render assistance. And I'm sitting here on Rule 7.3 apologizing to this Tribunal, and apologizing to the Mississippi State Bar Association. Because at that time under 7.3 I technically violated an ethical duty.
If I could go one step further. First, I technically made that violation under Rule 7.3, and then I compounded it, because I sent Fountain over there, I was responsible for what Fountain did. And if Fountain then went over there and behaved the way he said he did and tried to get this woman to sign something in her time of need, then that's another technical violation of Rule 5.3 on my part for which I again apologize to this Tribunal and to the Mississippi State Bar Association. I recognize the wrongdoing there. (emphasis added).
It is apparent that Emil has conceded his misconduct not only by his testimony, but also by the fact that his appeal is silent as to count three. He was found guilty of counts one, two, three, five, six and seven. He contested the sufficiency of the evidence on all counts but three.
The obstruction of evidence testimony concerns Joseph Graben. Graben was a process server who attempted to serve a subpoena issued by the Bar for E.M. Buckley directing Mr. Buckley to testify in this case on June 13, 1994. Graben attempted on May 19, 1994, to serve Mr. Buckley at Emil's office where Mr. Buckley was scheduled to give a deposition on that date and at that location. Graben was unable to do so, claiming that Emil prevented him from serving the subpoena. Emil testified that Graben did not properly attempt service but instead was asked to wait outside the office to serve the subpoena on Mr. Buckley since a deposition of Mr. Buckley was then underway.
The Bar wanted to have him as a live witness so as to cross-examine him at the hearing. During Emil's testimony on October 14, 1993, in support of his motion to dismiss the instant formal complaint, he testified that a necessary witness, E.M. Buckley, was not available for trial. However, when the trial reconvened on approximately June 15, 1994, Emil offered Buckley's testimony by video deposition. When Emil offered Buckley's video deposition, the Bar objected on several grounds including untimeliness and that the Bar's attempt to have Buckley appear as a live witness had been thwarted by Emil's intervention in the process server's attempt to serve Buckley with a subpoena.
The Bar argues that Emil has waived his right to object to the testimony of the process server. Emil had admitted his guilt as to count three; then he admitted Buckley's video deposition. Why Emil did so is unclear because it was after he conceded his guilt on the stand. Emil had thwarted the Bar's attempts to subpoena Buckley. Therefore, the Bar objected to his deposition testimony being admitted. It is the Bar's position that had Emil not offered Buckley's video deposition, there would have been no need for the Bar to present Graben's testimony.
Emil returns to a previous argument that Graben was not listed as a witness in any of *326 the Bar's responses to Emil's interrogatories. He incorporates his argument presented in Issue II(D). Although we have found that the Bar had a duty to list Wilder, we cannot with confidence reach the same result with Graben. The distinction is the way in which Graben's testimony was introduced compared to Wilder's. Wilder testified to Emil's reputation for truth and veracity. It was highly foreseeable, that such testimony would be offered by the Bar. However, Graben's testimony came out to support the Bar's objection to Buckley's video deposition.
When Emil offered the video deposition, the Bar objected stating its reasons by including the thwarting of the subpoena by Emil. Emil then testified to what occurred at his office. In rebuttal, the Bar called Graben himself to testify. Emil called a paralegal, Penny Paige, to surrebut the process server's testimony. Emil had not listed Paige as a witness in any of his discovery materials.
The Bar did not know to list Graben as a witness because they did not know that Emil was going to offer the video deposition of Buckley. In the matter of the rebuttal and surrebuttal witnesses each side ambushed the other. We can not with confidence say that the ambushes by either side were deliberate; and therefore, we find no error.

VI. WHETHER THE PUNISHMENT IMPOSED BY THE COMPLAINT TRIBUNAL WAS INAPPROPRIATE.
Emil first takes issue with the American Bar Association's Standards for Imposing Lawyer Sanctions. However, the Bar notes that in this case the Tribunal referred to these standards in its opinion and judgement, but they were not made a part of the already voluminous record. Regardless of whether they are properly before this Court, this Court's review is de novo and if it chooses it may review the standards. Moreover, we have previously relied upon and found helpful the ABA's standards when determining the appropriate sanction to be imposed. See Mississippi Bar v. Strauss, 601 So.2d 840, 845 (Miss. 1992); Mississippi State Bar v. Blackmon, 600 So.2d 166, 173 (Miss. 1992); Culpepper v. Mississippi State Bar, 588 So.2d 413, 421 (Miss. 1991); and Foote v. Mississippi State Bar Ass'n, 517 So.2d 561, 564 (Miss. 1987).
Emil contends that a reprimand is the appropriate remedy for the alleged conduct he committed. He then states that a "[r]eprimand is sufficient to cause the respondent to change his ways which it appears he has already done." From the record and the briefs in support thereof it appears that Mr. Emil is saying I did not do it, and I will not do it anymore. The question is "what is an appropriate sanction for the ethical violations of solicitation and sharing legal fees with a non-lawyer?" Emil says a reprimand is sufficient and the Bar says that Emil should be disbarred.
Emil argues that the Tribunal should have looked to the fact that no direct harm to any individual client or to the public at large is present in this case. It is well that Emil did not embezzle any of his client's money, but can it really be a mitigating factor? The fact that the lawyer upheld his ethical duty in another arena should not mitigate where he violates his ethical duty in another area of the law.
Emil then argues that this Court has addressed the purposes of punishment for ethical violations and provided a standard for determining sanctions. See Mississippi Bar v. Mathis, 620 So.2d 1213, 1222 (Miss. 1993). The Mathis factors are as follows:
(1) the nature of the misconduct
(2) the need to deter similar misconduct
(3) preservation of the dignity and reputation of the profession
(4) protection of the public
(5) sanctions imposed in similar cases.
Id. "Discipline `is not to punish the guilty attorney, but to protect the public, the administration of justice, to maintain appropriate professional standards, and to deter similar conduct.'" Broome v. Mississippi Bar, 603 So.2d 349, 353 (Miss. 1992)(quoting Steighner v. Mississippi State Bar, 548 So.2d 1294, 1297-98 (Miss. 1989)). Each of the above enumerated factors will now be discussed.

*327 Nature of the Misconduct
Emil contends that the only claimed violation is that of solicitation. This overlooks the Tribunal finding that Mr. Emil violated the ethical duty not to share fees with non-lawyers.
The Bar's claim is that the harm to the client is by over-reaching. When an attorney solicits a client who cannot reasonably consider the retention of an attorney, this is overreaching. The harm here is attempting to persuade a client to pursue a cause of action he really does not want to. The Tribunal stated in its opinion and judgment that all of the victims in the alleged acts were "persons suffering from the shock of loss or serious injury to loved one[s], persons who have suffered serious injuries and so on. They were vulnerable."
There is also the potential for overcharging as well as overreaching. The Moran case is a good example as Mr. Emil said that he had to have ten percent (10%) from the settlement in order to pay Fountain from the fees that were earned. Therefore, solicitation can harm a client and result in overcharging.
The Bar also asserts that the client may receive under-representation and the goals of the attorney soliciting the client may be one of other than the best interest of the client. A fast settlement along with a fast fee may not be in the client's best interest.
Solicitation has never been recognized as beneficial to the profession or to the client. It has the potential for creating litigation, creating fraudulent claims, and turning our profession from one of service to one of profit. Solicitation can result in a diminished status for the lawyer and be harmful to the profession's reputation. The Bar's official position on solicitation is difficult in light of the Bar's position on advertising. Perhaps solicitation is a lesser evil than it once was. At any rate, whatever the reason, we can not find a single case where solicitation alone was used as a basis for a disbarment.

Need to Deter Similar Misconduct
Emil argues that he has "cleaned up" his act and the Bar's need to deter similar misconduct has been satisfied. However, this element is not merely to deter the misconduct of the lawyer charged with the violations, but also to deter other members of the Bar from engaging in such misconduct. Solicitation is a serious ethical violation. Often lawyers solicit business from those in a situation who are unable to make an informed decision. Solicitation also invokes needless litigation. The need to deter similar misconduct among the bar at large is very strong.

Preservation of Dignity and Reputation of the Profession
Emil asserts that a public reprimand will sufficiently preserve the dignity and reputation of the profession. The Bar responds that allowing Emil to continue to practice law will not only not preserve the dignity and reputation of the profession, but will also hold the profession to ridicule. The legal profession today is under an extreme amount of pressure. It is constantly being scrutinized by the public. Public policy demands that we adequately discipline unethical attorneys to preserve the dignity and reputation of the legal profession.

Protection of the Public
Emil contends that there was no harm to the public financially and that any other harm is cured by the filing of the informal complaint. His reasoning is that since the filing of the informal complaint, Emil has brought his practice into the guidelines of the Disciplinary Rules. The Bar's position is that Emil is not the only lawyer engaged in the conduct condemned here and that the public needs protection from those lawyers similarly situated as well. Other lawyers need to get the message that this Court is taking seriously the ethical violations of certain attorneys. The public needs protection from lawyers who find it appropriate to solicit business at any time or place.

Sanctions Imposed in Similar Cases
In Mississippi State Bar v. Moyo, 525 So.2d 1289 (Miss. 1988), a lawyer was found guilty of soliciting business as well as some other egregious violations of the ethical duties of a lawyer. The list of his violations includes: solicitation, charging and securing *328 an unconscionable fee, no records kept on his disbursements, conversion of a client's money ($2,500), conversion of a client's money ($5,300) that should have been used to pay the client's medical bills, an attempt to obtain more of the client's money on an unsecured loan, and finally, failure to counsel his client's guardian as to her duties regarding his client's money. As a result of these violations, Moyo was permanently disbarred. However, there is a clear distinction between Emil and Moyo. Emil did not cheat, defraud, or convert client's funds in this case. However, he did solicit business.
When discussing the one count of solicitation, this Court held that "[f]or this violation alone, in a first offense, Moyo should receive a public reprimand." Moyo, 525 So.2d at 1298. Because this is not Emil's first offense, and he also was found guilty of attempting and actually sharing legal fees, Emil's sanction should be increased to not only a public reprimand, but also a suspension of his license. The Bar mentions the sanctions in other states. However, it is unnecessary to look to other states when this Court has clearly addressed the issue in Moyo.

CONCLUSION
Emil raised a number of procedural and substantive errors. Some with merit and others with none at all. The Tribunal's judgment is too severe for the alleged conduct. We find that for the solicitation of business the appropriate punishment for Mr. Emil is a public reprimand. We also find that Mr. Emil was guilty of soliciting business and sharing legal fees. For this violation we order suspension of Mr. Emil's license to practice law. The period of suspension from the practice of law is indefinite and solely contingent on Mr. Emil presenting proof from the Board of Bar Examiners that he has successfully passed all sections of the Mississippi Bar Examination. When Mr. Emil has accomplished this and filed his proof with this Court, an immediate order of reinstatement will issue.
SANCTION OF DISBARMENT REVERSED. COMPLAINT TRIBUNAL'S FINDINGS OF MISCONDUCT FOR THE SOLICITATION OF BUSINESS AFFIRMED. GERALD R. EMIL SHALL BE PUBLICLY REPRIMANDED. COMPLAINT TRIBUNAL'S FINDINGS OF MISCONDUCT FOR SOLICITING BUSINESS AND SHARING LEGAL FEES AFFIRMED. GERALD R. EMIL IS HEREBY SUSPENDED FROM THE PRACTICE OF LAW INDEFINITELY. REINSTATEMENT OF GERALD R. EMIL IS SOLELY CONTINGENT ON PROOF FROM THE BOARD OF BAR EXAMINERS THAT HE HAS SUCCESSFULLY PASSED ALL SECTIONS OF THE MISSISSIPPI BAR EXAMINATION. WHEN THIS PROOF IS PRESENTED TO THIS COURT AN IMMEDIATE ORDER OF REINSTATEMENT FOR GERALD R. EMIL WILL ISSUE.
DAN LEE, C.J., PRATHER, P.J., and JAMES L. ROBERTS, Jr., SMITH and MILLS, JJ., concur.
JAMES L. ROBERTS, Jr., J., concurs with separate written opinion.
BANKS, J., concurs in part and dissents in part with separate written opinion.
PITTMAN and McRAE, JJ., not participating.
JAMES L. ROBERTS, Jr., Justice, concurring:
Presiding Justice Sullivan has written well in a difficult case, as he routinely does, and I concur with him. Briefly, I wish to note a concern.
The time lapse between the institution of the proceedings and the filing of the formal complaint is bothersome, and my vote might be different, save and except that (1) neither Emil nor his counsel ever inquired of the Bar concerning the status of the allegations and, apparently, (2) Emil has not suffered any prejudice as a result of the delay.
For clarification, I invite the reader's attention to the opinion of Law Professor Aaron Condon, which states:
Condon, after being qualified as an expert in the field of legal ethics, testified that, based on his education, training, the factual *329 matters surrounding the time lapse between the filing of the informal complaint and the filing of the formal complaint, and based on reasonable professional certainty, he was of the opinion that General Counsel did not comply with the mandate of Rule 5, Rules of Discipline, which requires expeditious, timely and speedy handling of complaints. He further testified that in his opinion the time lapse between the institution of the proceedings and the filing of the formal complaint constituted prejudicial and impermissible delay which violated fundamental fairness and Emil's right to due process of law.
Gerald R. Emil v. The Mississippi Bar, slip op. 94-BA-00749-SCT at 10 (Miss. 1996).
While I concur in this case, I believe the time may be ripe for establishing specific deadlines in Rule 5 of the Rules of Discipline. Some matters speak for themselves, as does this factual situation, I think, and the finding of no prejudice suffered is somewhat problematical.
This situation has concerned me in previous cases, but I now think it should be given more consideration by the Bar, this Court, and others who are interested.
Improper conduct can not and should not ever be condoned, but specific time frames are well established in most areas of the law, and it may now be proper to add an omega to this alpha.
BANKS, Justice, concurring in part and dissenting in part:
I agree that Emil's conduct should be punished but, in my view, the bar examination should not be considered a sanction and to the extent that it can be used as such, it should not be used in this case.
The purpose of the bar examination is to test for minimum competency. While it exacts stress and most lawyers would want to avoid retaking it (or, as here, taking it for the first time) we should not encourage the view that it is punitive. We require the examination where an attorney has been disbarred because he, through disbarment has become "permanently" unlicensed and it should be expected that for one to become licensed again they should do what was necessary to achieve the license the first time. Additionally, one who has been disbarred has, ipso facto, been away from the practice of law for a period sufficient to allow legal knowledge and skill to deteriorate.
In disciplinary proceedings, a requirement that one pass the bar examination should arise, in my view, from the nature of the offense. Failure of competent representation, for example, continued failure to meet deadlines, or continued bringing frivolous claims, is an offense out of which legitimate concern about competency might arise. The bar examination might be appropriate as a "sanction" in such cases.
This case has nothing to do with competency. It has to do with greed and disregard of the rules of the profession. The Tribunal recommends suspensions totaling a year and half. Depending upon when this decision is handed down, the majority suspension could last from three months until Emil passes the examination. The bar examination is given starting on the Monday before the last Wednesday in February and July and the results are available in approximately six weeks after the examination. A disbarred attorney has to apply not less than thirty days prior to the examination. Presumably, the same rule would apply to an attorney taking the bar examination as a sanction. Thus, Emil could take the February exam even if this mandate issues in mid to late January. He could be back in practice in mid-April. A week or so difference in the issuance of the mandate might result in five month greater minimum period of suspension.
This, of course, assumes that he will pass the examination. While there is no guarantee, if he cannot, he should have no claim to practice. The question, however, is what conduct should be deemed to trigger reexamination. In my view, it should be conduct for which one loses one's license or conduct touching upon competency. The conduct here involved is neither. In my view, Emil should be subjected to a one year suspension and required to take and pass the Multi-State *330 Professional Responsibility Examination during the period of suspension.
Why isn't a flat one year suspension, requiring passing the ethics examination, perhaps even taking a law school course in ethics and passing that, plus a substantial fine, more appropriate to the offense committed?
NOTES
[1] This Rule was not in effect when the alleged conduct occurred. Thus, this Court will look only to the alleged violations of the Mississippi Code of Professional Responsibility.